## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

No. 16-4241

MARY ANN SIVOLELLA, for the use and benefit of the EQ/Common Stock Index Portfolio, the EQ/Equity Growth PLUS Portfolio, the EQ/Equity 500 Index Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value, and the EQ/Intermediate Government Bond Index Portfolio

*Plainitffs-Appellants*

v.

AXA EQUITABLE LIFE INSURANCE COMPANY and AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC

*Defendant-Appellees*

(D.N.J. No. 3-11-cv-04194)

GLENN D. SANFORD, for the use and benefit of the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/T. Rowe Price Growth Stock Portfolio and the EQ/GAMCO Small Company Value Portfolio; WILLIAM R. TUCKER, for the use and benefit of the EQ/GAMCO Small Company Value Portfolio and the EQ/T. Rowe Price Growth Portfolio; BRIAN A. SANCHEZ, for the use and benefit of the EQ/Global Multi-Sector Equity Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio; MARY T. CUSACK, for the use and benefit of the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio and the EQ/Mid Cap Value PLUS Portfolio; ROBERT CUSACK, for the use and benefit of the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio and the EQ/Mid Cap Value PLUS Portfolio; PATRICIA F. LYNN, for the use and benefit of the EQ/Global Bond PLUS Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio

*Plainitffs-Appellants*

v.

AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC

*Defendant-Appellees*

(D.N.J. No. 3-13-cv-00312)

ON APPEAL FROM A FINAL ORDER OF JUDGMENT ENTERED IN THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
Civil Action Nos. 3:11-cv-04194 and 3:13-cv-00312-PGS-DEA

**BRIEF ON BEHALF OF PLAINTIFFS-APPELLANTS**

Arnold C. Lakind
SZAFERMAN, LAKIND,
 BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Rd, Ste 200
Lawrenceville, N.J. 08648
Telephone: (609) 275-0400
Fax: (609) 275-4511
alakind@szaferman.com
*Attorneys for Plaintiffs-Appellants*

1090879.1

# **TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

             1.    FMG's Management of the Plaintiffs' Funds . . . . . . . . . . . . 3

             2.    The Unique Role of FMG and AXA . . . . . . . . . . . . . . . . . . . 5

      B.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    Identification of Rulings with Reference to the Record . . . . . . . . . 8

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      POINT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      THE TRIAL COURT ERRED WHEN IT FOUND THAT THE
      EQAT BOARD WAS CAREFUL AND CONSCIENTIOUS
      AND THUS FULFILLED ITS "WATCHDOG" FUNCTION
      AND THIS MATTER SHOULD BE REMANDED TO ALLOW
      THE DISTRICT COURT TO RE-CALIBRATE THE PROPER
      LEVEL OF DEFERENCE TO EXTEND TO THE BOARD'S
      DECISIONS

      A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      B.    The Fiduciary Duty Imposed by § 36(b) . . . . . . . . . . . . . . . . . . . . 15

C.    A Fund Board Must Be Fully Informed . . . . . . . . . . . . . . . . . . . . . . 17

D.    Flaws in the Board Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    1.    Mr. Joenk, FMG's Chief Executive Officer, Should
       Not Have Served as the Board Chair . . . . . . . . . . . . . . . . . . . 19

    2.    The Trial Court Erred When it Ignored the Implications
       of its Finding That FMG Did Not Adequately Account
       for Allocated Costs Purportedly Incurred by AXA . . . . . . . . 21

       a.    Although The Court Found that AXA's Allocated
          Costs Were Not Properly Accounted For, It Failed
          to Assess the Ramifications of This Finding . . . . . . . . 23

       b.    The Board Was Remiss Because it Failed to
          Require a Quarterly Accounting of Allocated Costs
          and the Court Erred When it Did Not Address this
          Argument in Its Assessment of the Board's Care . . . . 25

    3.    The Board Failed to Consider Benefits Which Accrued
       to AXA and Its Affiliate as a Result of Their Relationship
       to the Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    4.    FMG Provided Misleading Profit Information to The
       Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    5.    The Board Was Given Misinformation About Comparable
       Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    6.    The Trial Court Found That The Board, in Later Years,
       Made Improvements And the Court Recommended Others
       But The Court Did Not Consider This Evidence in its
       Assessment of the Board's Level of Diligence . . . . . . . . . . . 34

D.    Other Fund Boards Have Engaged in a Far More Rigorous
      Process When Evaluating Adviser Compensation . . . . . . . . . . . . . 35

E.    This Case Should Be Remanded to Allow the Trial Court to
      Re-Calibrate the Level of Deference to Be Afforded to the
      Board's Decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

POINT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

THERE WAS EXTENSIVE EVIDENCE IN THE RECORD OF
THE FEES RECEIVED BY FMG FOR MANAGEMENT AND
ADMINISTRATION

POINT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

EVEN WERE THE COURT TO DEFER TO THE DETERMINATION
OF THE BOARD TO APPROVE FMG'S COMPENSATION, THAT
COMPENSATION DOES NOT HAVE THE EARMARKS OF AN
ARM'S-LENGTH BARGAIN

A.    Nature and Quality of Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      1.    FMG Performed Minimal Services, at a Small Cost,
            Using Few Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      2.    The Quality of the Service Provided to the Funds Was
            Poor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

B.    The Profitability of the Funds Was Excessive . . . . . . . . . . . . . . . . 49

C.    Fall-out Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

D.    Comparative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

E.    Economies of Scale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

F.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

POINT IV  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

THE COURT ERRED IN ITS TREATMENT OF DAMAGES

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

# TABLE OF AUTHORITIES

**Page**

## Cases

*American Soc. for Testing & Materials v. Corrpro. Cos.,*
   478 F.3d 557 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Daily Income Fund, Inc. v. Fox,*
   464 U.S. 523 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Doe v. Menefee,*
   391 F.3d 147 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*First Nat'l Bank & Tr. Co. of Racine v. Vill. of Skokie,*
   190 F.2d 791 (7th Cir. 1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *24*

*Fogel v. Chestnutt,*
   533 F.2d 731 (2d Cir. 1975),
   *cert. den.,* 429 U.S. 824 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Frank Lyon Co. v. United States,*
   435 U.S. 561 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Galfand v. Chestnutt Corp.,*
   545 F.2d 807 (2d Cir.1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29, 36

*Gallus v. Ameriprise,* 497 F. Supp. 2d 974 (D. Minn. 2007)
   *rev'd,* 561 F.3d 816 (8th Cir. 2009),
   *remanded,* 559 U.S. 1046 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 56

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
   528 F. Supp. 1038 (S.D.N.Y. 1981),
   *aff'd,* 694 F.2d 923 (2d Cir. 1982),
   *cert. den.,* 461 U.S. 906 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    573 F. Supp. 1293 (S.D.N.Y. 1983),
    *aff'd*, 740 F.2d 190 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Hayes v. Invesco, Inc.,*
    907 F.2d 853 (8th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Evangelist,*
    760 F.2d 27 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*In re Frescati Shipping Co.,*
    718 F.3d 184 (3d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*In re Las Colinas, Inc.,*
    426 F. 2d 1005 (1st Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*In the Matter of Commonwealth Management LLC,*
    Release No. 31678,
    2015 WL 3760794 (SEC, Aug. 8, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In the Matter of Smith Barney Fund Management, LLC and*
    *Citigroup Global Market, Inc.,*
    SEC File No. 3-11935,
    2005 WL 1278368 (May 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Jones v. Harris Assocs.,*
    559 U.S. 335 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kalish v. Franklin Advisers, Inc.,*
    742 F. Supp. 1222 (S.D.N.Y. 1990),
    *aff'd*, 928 F.2d 590 (2d Cir.),
    *cert. den.*, 502 U.S. 818 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . 33, 48, 56

*Krinsk v. Fund Asset Management, Inc.,*
    715 F. Supp. 472 (S.D.N.Y. 1988),
    *aff'd*, 875 F.2d 404 (2d Cir.),
    *cert. den.*, 493 U.S. 919 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 48, 56

*Lansford-Coaldale Joint Water Authority v. Tonolli Corp.,*
    4 F.3d 1209 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Leigh v. Engle,*
    727 F.2d 113 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Meyer v. Oppenheimer Mgmt. Corp.,*
    895 F.2d 861 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Nedd v. United Mine Workers of America,*
    556 F.2d 190 (3d Cir. 1977),
    *cert. den.,* 434 U.S. 1013 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*N.L.R.B. v. Amax Coal Co.,*
    453 U.S. 322 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Norwest Bank Minnesota v. Blair Road Associates, LP,*
    252 F. Supp. 2d 86 (D.N.J. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 61

*Pepper v. Litton,*
    308 U.S. 295 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 51, 57

*Pfeiffer v. Integrated Fund Servs., Inc.,*
    371 F. Supp. 2d 502 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Roberts v. Ross,*
    344 F.2d 747 (3d Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.,*
    663 F. Supp. 962 (S.D.N.Y.),
    *aff'd,* 835 F.2d 45 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . 35, 49, 56

*Scully v. US WATS, Inc.,*
    238 F.3d 497 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Sec. & Exch. Comm'n v. Capital Gains Research Bureau,*
    375 U.S. 180 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Tatam v. RJR Pension Inv. Committee*,
    761 F.3d 346 (4th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

*Tcherepnin v. Knight*,
    389 U.S. 332 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Traylor v. U.S.*
    396 F.2d 837 (6th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

*U.S. v. Mead Corp.*,
    533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## Federal Statutes

15 U.S.C. § 80a-1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. § 80a-2(a)(20)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

15 U.S.C. § 80a-15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. § 80a-16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. § 80a-35(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

## Regulative Cites

17 C.F.R. § 270 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## Federal Rules

Fed. R. Civ. P. 52(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 61

## Other Authorities

A. Scott, *Law of Trusts,* § 172 (3d ed. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

G. Bogert, *The Law of Trusts and Trustees* (rev. 2d ed. 1983) . . . . . . . . . . . . . . . 24

17 C.F.R. § 270 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

69 Fed. Reg. 46378, 2004 WL 170783 (August 2, 2004) . . . . . . . . . . . . . . . . . . 21

Restatement (Third) of Trusts, § 83 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

9C Charles Wright, Arthur Miller & Alan Kane,
     *Federal Practice and Procedure (Civil)* § 2578 (3d ed. 2008) . . . . . . 43, 60

## JURISDICTIONAL STATEMENT

Plaintiffs appeal a judgment of the United States District Court for the District of New Jersey which dismissed their complaint after trial. This appeal is brought on behalf of four mutual funds managed and administered by Defendant, AXA Equitable Funds Management Group, LLC ("FMG"), which are subsidiaries of Defendant, AXA Equitable Life Insurance Company ("AXA"). Plaintiffs' derivative complaint alleged that FMG violated the fiduciary duty imposed upon it by 15 U.S.C. 80a-35(b), also known as § 36(b) of the Investment Company Act of 1940 ("§ 36(b)"), with regard to the compensation that the mutual funds paid to FMG. The District Court had jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 80a-35(b)(5). This Court has appellate jurisdiction to review the dismissal of Plaintiffs' Complaint pursuant to 28 U.S.C. § 1291. The order of dismissal was filed on August 25, 2016 (JA1), and Plaintiffs filed a motion for reconsideration on September 20, 2016. Following the denial of Plaintiffs' motion to reconsider on December 1, 2016 (JA167-JA168), Plaintiffs, on that date, filed a notice of appeal. (JA161-JA164). This is a timely appeal from a final judgment disposing of all claims.

## ISSUES PRESENTED

1.     Did the district court correctly apply the principles set forth in *Jones v. Harris Associates*, 559 U.S. 335 (2010) (*"Jones"*) when it decided to extend substantial deference to the decisions of the Board of Trustees ("the Board") of the Plaintiffs' mutual funds which approved the advisory and administrative fees paid to the funds' investment adviser, FMG, even though FMG's Chief Executive Officer served as the chair of the Board and the Board was mislead and misinformed by FMG; if the district court erred, must this matter be remanded to allow the district court to determine what, if any, deference to extend to the Board's decisions?

2.     Whether there was sufficient evidence in the record from which the court could have determined FMG's advisory and administrative compensation?

3.     Did the district court, with regard to each fund for each year, correctly apply the legal principles set forth in *Jones* when it decided that the compensation paid to FMG "carrie[d] the earmarks of an arm's length bargain," *id.* at 347, when the court (a) found that FMG did not properly account for $49 million in AXA's allocated costs; (b) failed to consider the substantial benefits that accrued to AXA as a consequence of FMG's relationship to the funds; (c) misapprehended the extent of FMG's services; (d) ignored significant evidence of the funds' poor

performance; (e) miscalculated FMG's profits; and (f) failed to recognize that

FMG's fees exceeded those of its competitors?

4.    Did the court properly address damages?

## STATEMENT OF THE CASE

### A.    Statement of Facts

#### 1.    FMG's Management of the Plaintiffs' Funds

A mutual fund consists of a portfolio of securities, generally equities or

fixed income instruments, which are derivatively owned by mutual fund investors.

*Jones,* at 338.  A mutual fund, also called an investment company, is generally

formed by an investment adviser who then appoints a board of trustees or board of

directors charged with a fiduciary duty to protect investors.  *Id.*  The board

annually negotiates one or more agreements with the adviser, which includes

agreements to invest fund assets (investment management agreement), to

administer the fund (administrative agreement), and to market the fund's shares

(distribution agreement).  As a consequence of the difficulty of replacing an

adviser, the "relationship between a fund and its investment adviser," the Supreme

Court has written, is "'fraught with potential conflicts of interest . . ..'" *Id.* at 338-9

(citations omitted); *see also Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536

(1984).

FMG formed the funds owned by Plaintiffs, placing them in a trust known as the EQ Advisors Trust. (the "EQAT") (JA37; JA264). FMG manages approximately 120 funds, most are within the EQAT. (JA4103).

Twelve funds were at issue at trial. Most of the larger funds were index funds, which are funds whose performance is intended to track a publicly available index, such as the "S&P 500 Index." These funds are called passively managed funds because the adviser does not have the responsibility to evaluate and select investments. (JA38-JA39). The second category of funds were actively managed; the adviser evaluates and selects investments for these funds. (JA38). The third category of funds, called hybrid or pactive funds, combine index and actively managed components. (JA39). This appeal seeks reversal and remand for a new trial on behalf of the four index funds only: the EQ/Common Stock Index Fund, the EQ/Equity 500 Index Fund, the EQ/Core Bond Index Fund, and the EQ/Intermediate Government Bond Index Fund (the "Funds").[1]

Pursuant to an Investment Management Agreement ("IMA") between FMG and the EQAT, FMG promised to manage the Funds for a "management fee" it negotiated with the EQAT board (the "Board"). (JA148-JA156; JA807; JA817).

---

[1] The evidence with regard to the nature and quality of FMG's services, fund performance, and profits with regard to the other eight funds is less clear than the evidence with regard to the index funds.

Pursuant to a "Mutual Fund Service Agreement" ("MSA"), FMG promised to administer the Funds for an additional fee. (JA154-JA157; JA1777-JA1791).

The IMA and MSA provide that fees are to be calculated by multiplying the value of the assets in each fund times a percentage set forth in a fee schedule which is attached to each agreement. The percentage management fee for the EQ/Equity 500 Index Fund was .25%. (JA817). The percentage management fee for the three other index Funds was approximately .35%. (JA817). FMG's administrative fee percentage was approximately .12%. (JA1791). All fee schedules are set forth at pages 147 to 156 of the Court's Opinion (JA148-JA157) and the management fees, administrative fees, sub-advisory fees, and sub-administration fees for each Fund for each year are set forth at page 62 below.

## 2.    The Unique Role of FMG and AXA

In two important respects, this case differs from the overwhelming majority of reported § 36(b) cases. First, unlike those cases, all of the funds at issue here are sub-advised and sub-administered, which means that the day-to-day investment management and administrative tasks which FMG was contracted to perform are actually performed by other agents of the EQAT. (JA1248; JA1250; JA1424; JA1427; JA1490; JA1491; JA1512; JA1519; JA1837; JA3811-JA3812; JA3862-JA3864). These agents who perform investment management tasks are

called sub-advisors; those who perform fund administration are called sub-administrators.

The EQ/Common Stock Index Fund and the EQ/Equity 500 Index Fund are sub-advised by an AXA affiliate, AllianceBernstein, L.P. (JA819-JA821; JA827; JA3933); the EQ/Core Bond Index Fund and the EQ/Intermediate Government Bond Index Fund are sub-advised by an unaffiliated sub-advisor, Ssga Funds Management, Inc. (JA852-JA853). All four funds are sub-administered by JPMorgan, who performs the bulk of the required administrative tasks pursuant to the MSA. (JA200; JA890-JA909; JA1427; JA1648-JA1652; JA1780-JA1796). Plaintiffs do not contest the compensation that the Funds paid to the sub-advisors or to JPMorgan; Plaintiffs contest the compensation that the Funds paid to FMG.

This case differs from other § 36(b) cases in a second respect. Each EQAT mutual fund is a purchase option for a deferred annuity issued by FMG's parent, AXA. (JA1541). A deferred annuity provides for the payment of periodic installments to investors following a triggering event, often death or retirement. (JA1542-JA1567). The amount of this payment depends upon the historical performance of the underlying mutual funds. (JA1556; JA1567).

AXA charges each investor additional fees for its deferred annuities called a variable annuity premium, "separate account" or "product wrapper" fee. (JA675-

JA677; JA1537; JA1544; JA3999; JA4182; JA5205-JA5206). This annual fee ranges between 1.49% and 2% of the assets invested in the underlying mutual fund. (JA1544). In addition, each annuity contract imposes a termination fee that may be as high as 6%. (JA1544). As a result of that termination fee, investors are, for practical purposes, captives of FMG and AXA. The total product wrapper fees paid to AXA from the funds in the EQAT managed by FMG ranged between $200 million and $900 million annually. (JA1647; JA1672; JA1678-JA1684).

As discussed below, the compensation which FMG received from the investors for mutual fund management and administration was inconsistent with the fiduciary duty imposed upon FMG by § 36(b). As a result, the court's ultimate conclusion, that Plaintiffs' failed to demonstrate that FMG's compensation lacked the "earmarks of an arm's length bargain," *Jones* at 347, was wrong.

## B.    Procedural History

Plaintiffs filed this case as a derivative action on behalf of 12 mutual funds purported to be managed by Defendant, FMG. Plaintiffs, Mary Ann Sivolella *et al,* filed their Complaint on July 21, 2011. Plaintiffs, Glen D. Sanford, *et al,* filed their Complaint on January 13, 2013. The cases, both alleging violations of § 36(b), were consolidated on January 22, 2013 and the matter came on for trial on January 6, 2016. On August 25, 2016, the court issued its opinion dismissing

Plaintiffs' Complaint with prejudice. (JA2-JA160). On December 1, 2016, the court denied Plaintiffs' motion to reconsider several aspects of that opinion (JA167-JA168) and this appeal followed. (JA161-JA164).

## C.    Identification of Rulings with Reference to the Record

Plaintiffs challenge the trial court's final determination that the management and administrative compensation paid to FMG by the Funds "carrie[d] the earmarks of an arm's length bargain," *Jones* at 347–8, when that compensation is evaluated against all "surrounding circumstances," *id.* at 344, 347, 349, including the factors set forth in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), *cert. den.*, 461 U.S. 906 (1983) ("*Gartenberg*"). (JA147).

The court erred when it made this determination for three reasons. First, it is based on the court's erroneous conclusion that the EQAT Board fulfilled its role as a "watchdog" for fund investors. *Jones* at 348. (JA56). Because the Board did not fulfill that role, it was incumbent upon the court to "take a more rigorous look at the outcome." *Id.* at 351. Second, the court wrongly found that Plaintiffs did not introduce evidence about the portion of the fee paid to FMG, often 20 times larger than the fee paid to the sub-advisors and JPMorgan (JA267-JA271), who did the actual day-to-day work. (JA1248; JA1250; JA1424; JA1490). Third, even had the Board fulfilled its "watchdog" role, the court erred when it failed to

determine that FMG's compensation bore no reasonable relationship to the services that it rendered and, thus, that compensation could not have been the product of arm's length bargaining. *Jones* at 347, 351.

In addition, Plaintiffs challenge the court's analysis of Plaintiffs' damages claim. (JA144-JA147).

## SUMMARY OF ARGUMENT

Section 36(b) imposes a fiduciary duty upon investment advisers with regard to the "receipt of compensation" for their services. The Supreme Court, in *Jones v. Harris,* 559 U.S. 335, ruled that to determine whether an adviser has fulfilled this fiduciary duty, a court must assess whether "from the viewpoint of . . . those interested therein," the compensation arrangement *"under all the circumstances . . . carries the earmarks of an arm's length bargain." Id.* at 347. (emphasis in original). This assessment is a broad one and requires consideration of all "surrounding circumstances." *Id.* at 347–8.

The § 36(b) analysis has both procedural and substantive components. *Id.* at 351. The procedural component assesses whether a fund board fulfilled its role as a "watchdog" for investors. *Id.* at 348. This assessment requires an evaluation of whether a fund board was fully informed and conscientious when it approved an adviser's compensation, which in turn determines the level of deference, if any,

to be afforded the Board's decision. *Id.* at 349. The EQAT Board did not fulfill its "watchdog" role when it approved the fees at issue.

The EQAT Board was chaired by FMG's Chief Executive Officer, Steven Joenk, who controlled the information given to the Board (JA41) and whom, the court found, was "motivated to ensure that FMG receives higher fees," was potentially biased, and gave "evasive" responses in the course of trial. (JA10; JA25-JA26). The court erred when it found that the Board was able to fulfill its "watchdog" function notwithstanding Mr. Joenk's role as Board Chair. *Id.* at 348.

Among the information that Mr. Joenk provided to the Board was a review of FMG's costs, which included approximately $49 million in expenses which AXA annually allocated to the EQAT; this amount far exceeded any other management or administrative expense paid to FMG by the EQAT. The court properly found that FMG failed to adequately account for these expenses. (JA113-JA114). Yet, it ignored this finding in its assessment of whether the Board fulfilled its "watchdog" role and merely recommended that the "Board should review" this issue. (JA104-JA115; JA116, n.32). In addition, the court failed to address the Board's decision, based on the erroneous advice of Mr. Joenk (JA1647; JA1684; JA3999-JA4012; JA4182), that it should not consider hundreds of millions of dollars in additional fees paid to AXA by the Funds notwithstanding

*Jones'* charge that "all surrounding circumstances" be considered. *Id.* at 344, 347, 349. These deficiencies, coupled with several other flaws in the Board's process, undermined the Board's ability to fulfill its "watchdog" role. *Id* at 348. This matter should be remanded to allow the trial court to determine what, if any, level of deference the district court should have extended to the Board's decisions to approve FMG's fees.

Even when a board is fully informed and conscientious, an adviser's fees may be found to be excessive, but that finding must be based on evidence that

> the fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."

*Id.* at 351; quoting *Gartenberg*, 694 F.2d at 928.

This inquiry contemplates consideration of "all surrounding circumstances," *Jones at* 344, 347, 349, among them several non-exclusive factors, called the *Gartenberg* factors, which include: (1) the nature and quality of the services provided to the fund by the adviser; (2) the "adviser-manager's cost in providing the service" and the profitability of the fund to the adviser; (3) any "fall-out" or collateral financial benefits accruing to affiliates of the adviser; (4) comparative fee structure; and (5) economies of scale. *Jones*, 559 U.S. at 344-45 & n. 5. When evaluated against these factors, it is apparent that FMG's compensation does not

carry "the earmarks of an arm's-length bargain." *Id.* at 347.

The starting point for this analysis is the identification of the compensation received by FMG for its advisory and administrative services to each Fund. The court wrongly concluded that Plaintiffs did not elicit this evidence. (JA71). In doing so, it ignored exhibits which set forth the management and administrative fees paid by the EQAT (JA1270-JA1272; JA1277; JA1283-JA1286; JA1305-JA1308; JA1328-JA1330; JA1333; JA1363-JA1365) as well as tables that set forth what portion of those fees was retained by FMG. (JA334-JA336; JA340-JA342). The court also ignored the testimony of Mr. Joenk in which he described several ways to calculate FMG's compensation under § 36(b). (JA3973-JA3979; JA5044-JA5051).

Once FMG's compensation under § 36(b) is determined, it is necessary to compare that amount to the services actually provided by FMG considering all "surrounding circumstances," *id.* at 344, 347, 349 including the *Gartenberg* factors. The court, inexplicably, failed to do a fund by fund - year by year - analysis. Had it done so, that analysis would have demonstrated that FMG's compensation was excessive. FMG serviced each Fund with a small complement of employees (JA954; JA1020; JA3848-JA3849) and many of the services which the court ascribed to FMG were not even provided by FMG to the index Funds.

As for the quality of FMG's services, 3 of the 4 index Funds performed worse than 75% of their peers when measured on a 3 and 5 year basis, according to the Board's consultant, Lipper, Inc.[2] ("Lipper"). (JA5801; JA1408; JA1406; JA1397; JA1395). Even FMG characterized these funds as perennial "underachievers." (JA5802). FMG's costs for its actual services were small and each Fund was enormously profitable enabling FMG to earn millions of dollars and achieve a profit percentage significantly above industry averages. (JA3852-JA3853; JA3973-JA3977; JA5034-JA5042).

Another *Gartenberg* factor, "fall-out benefits," are collateral benefits that accrue to the adviser or its affiliates as a result of the adviser's relationship to the funds. *Jones* at 345, n. 5. The trial court found, notwithstanding uniformly contrary testimony, that sub-advisory fees paid by the Funds to AXA's subsidiary, AllianceBernstein, were not fall-out benefits. (JA129-JA131). In addition, it ignored hundreds of millions of dollars in premiums paid to AXA on its deferred annuities. (JA122-JA131). These omissions cannot be reconciled with *Jones'* admonition that "all surrounding circumstances," be considered. *Id.* at 344, 347,

---

[2]Lipper, Inc. is a data provider retained by mutual funds or their advisers to provide comparative fee and/or performance information. According to Defendants' expert, it is widely used by fund boards to assess performance. (JA5583-JA5584).

349.

In addition, Plaintiffs' experts testified that the management and administrative fees for all four of the Funds were excessive. (JA4609-JA4610; JA4695-JA4702). The data reviewed by Defendants' expert, Christopher James, revealed that the fees of three of the four Funds significantly, exceeded the fees of their peers. (JA5465-JA5466).

Finally, the court erred in its assessment of Plaintiffs' damage proofs. It disregarded Plaintiffs' disgorgement argument and, in addition, improperly concluded that Plaintiffs' damage models were inadequate. Plaintiffs provided the court with a sufficient methodology to compute damages supported by expert testimony (JA4514-JA4524) and, in their proposed findings of fact, arithmetic calculations based on admitted evidence. (JA375-JA403). The Court abdicated its responsibility under FED. R. CIV. P. 52(a)(1) to make independent findings and instead focused on perceived flaws in Plaintiffs' Proposed Findings of Fact.

# ARGUMENT

## POINT I

**THE TRIAL COURT ERRED WHEN IT FOUND THAT THE EQAT BOARD WAS CAREFUL AND CONSCIENTIOUS AND THUS FULFILLED ITS "WATCHDOG" FUNCTION AND THIS MATTER SHOULD BE REMANDED TO ALLOW THE DISTRICT COURT TO RE-CALIBRATE THE PROPER LEVEL OF DEFERENCE TO EXTEND TO THE BOARD'S DECISIONS**

### A.    Standard of Review

A trial court's underlying factual findings are reviewed for clear error, the interpretation and application of legal precepts to those facts are reviewed *de novo. American Soc. for Testing & Materials v. Corrpro. Cos.,* 478 F.3d 557, 566 (3d Cir. 2007). A District Court's fact findings are clearly erroneous

> where the court has failed to synthesize the evidence in a manner that accounts for conflicting evidence . . .. Thus, we have reversed factual findings where . . . the court failed to weigh all of the relevant evidence before making its factual findings . . . *Hayes v. Invesco, Inc.,* 907 F.2d 853, 856-57 (8th Cir.1990) (holding that fact findings were clearly erroneous where the district court misinterpreted some evidence and failed to consider some testimony).

*Doe v. Menefee,* 391 F.3d 147, 164 (2d Cir. 2004) (citations omitted). The court's determinations addressed in Point I should be reviewed *de novo.*

### B.    The Fiduciary Duty Imposed by § 36(b)

When Congress enacted the Investment Company Act in 1940, it recognized that the national interest is adversely affected

> when investment companies are organized, operated, managed, . . . in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof . . . rather than in the interest of all classes of such companies' security holders.

15 U.S.C. § 80a-1(b)(2). As a result, Congress imposed a number of reforms, some dealing with the composition of fund boards, that were intended to prevent excessive advisory compensation. *See e.g.* 15 U.S.C. §§ 80a-15, 16.

It later became apparent to Congress that fund boards had not provided "effective representation of mutual fund shareholders in dealings [with] investment advisers" and lawsuits challenging advisory fees were largely ineffective due to the "standards employed by courts to judge the fees." *Daily Income Fund,* 464 U.S. at 537. Thus, Congress, in 1970, adopted 15 U.S.C. §80a-35(b), §36(b), which provides in part as follows:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company . . . to such investment adviser or any affiliated person of such investment adviser.

The scope of this fiduciary duty was most recently construed by the Supreme Court in *Jones,* 559 U.S. 335. Analogizing the role of an investment adviser to that of a corporate director, the Court wrote that a fiduciary's "dealings with the corporation are subjected to rigorous scrutiny," implicating questions of

"good faith" and the transaction's

> inherent fairness from the viewpoint of the corporation and those interested therein . . . . *"The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain."*

*Id.* at 346-47 (quoting *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939) (emphasis in original).

In order to assess whether or not a fee "carries the earmarks of an arm's-length bargain," the Court required consideration of "all relevant circumstances," *Id.* at 347-48, and directed that "all pertinent facts must be weighed." *Id.* at 344. This inquiry has both procedural (addressed in this Point I) and substantive components (addressed in Point III). *Id.* at 351.

## C.    A Fund Board Must Be Fully Informed

The procedural inquiry anticipates an assessment of a board's level of care and conscientiousness. Did the Board fulfill its role as an "independent watchdog" to protect shareholder interests? *Id.* at 348-9. Depending upon the outcome of that assessment,

> a measure of deference to a board's judgment may be appropriate in some instances. . . .[T]he appropriate measure of deference varies depending on the circumstances.

*Id.*, at 349. Even if a board's process is found to be robust, a "fee may be

excessive" if "'it is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.'" *Id.* at 351 (quoting *Gartenberg*, 694 F.2d at 928). This substantive assessment examines all "surrounding circumstances." *Jones* at 347-8, among them, the *Gartenberg* factors. *See Jones* at 345, n.5.

Several principles inform the procedural inquiry. First, an adviser has an affirmative duty to disclose all material information to a fund board. *Jones,* at 351-52. Second, a fiduciary is required to make disclosures in all areas in which there is even a "possible conflict" of interest between a board and an investment adviser. *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 811 (2d Cir.1976). Third, the adviser must not mislead a board and must strive to perform to the "highest ethical standards." *Sec. & Exch. Comm'n v. Capital Gains Research Bureau*, 375 U.S. 180, 187, 194 (1963); *Fogel v. Chestnutt,* 533 F.2d 731, 745 (2d Cir. 1975), *cert. den.*, 429 U.S. 824 (1976). Fourth, if a board's process is less than "robust," the Court should not give "considerable weight" to the board's decision and "the court must take a more rigorous look" at the fairness of the fee. *Jones,* at 351-52.

The court's discussion of the EQAT Board's care and conscientiousness, at pages 39 to 55 of the opinion (JA40-JA56), is highly generalized, focusing on member diversity, Board education, and the like. Plaintiffs, in contrast, advanced

specific arguments about flaws in the board process and in information provided

to the Board. (JA274-JA333). The court's opinion ignores much of Plaintiffs'

evidence. In addition, the court's analysis is contradictory and fails to address the

fact that there was no evidence that board members, likely overwhelmed by the

20,000 pages of material posted on an internet site each year, even read this

material. (JA3875-JA3876; JA4213-JA4215; JA5618). The court therefore erred

when it failed to conclude that the Board did not fulfill it's "watchdog" function.

## D.    Flaws in the Board Process

### 1.    Mr. Joenk, FMG's Chief Executive Officer, Should Not Have Served as the Board Chair

FMG's chief executive officer, Steven Joenk, also served as chair of the

EQAT Board. (JA41). Mr. Joenk, the court found, "gives presentations to the

Board on the *Gartenberg* factors, and generally controls the information contained

in the presentations"; in addition, he "runs the meeting[s]." (JA41-JA42). While

those with dual loyalties can serve as mutual fund trustees, a careful board would

not have allowed an adviser's chief executive officer to serve as its chair and

allow that trustee to control information provided to the board.

As the Supreme Court has observed in a case involving trustees of an

investment fund:

> Under principles of equity, a trustee bears an unwavering duty of complete
> loyalty to the beneficiary of the trust, to the exclusion of the interests of all
> other parties. To deter the trustee from all temptation and to prevent any
> possible injury to the beneficiary, the rule against a trustee dividing his
> loyalties must be enforced with "uncompromising rigidity." A fiduciary
> cannot contend "that, although he had conflicting interests, he served his
> masters equally well or that his primary loyalty was not weakened by the
> pull of his secondary one."

*N.L.R.B. v. Amax Coal Co.,* 453 U.S. 322, 329-30 (1981) (citations omitted).

Measured by this test alone, FMG has forfeited any argument that the Board's

approval of its fees warrants any deference whatsoever.

This conflict is not, however, merely theoretical. The trial Judge found that

Mr. Joenk "is motivated to ensure that FMG receives higher fees, . . . rather than to

protect the interest of investors," "he is biased as to the profits of FMG and AXA,"

and his role "calls into question whether he made accurate statements and

presentations." (JA25-JA26). At trial, his answers were, the court observed,

"often evasive." (JA10, n.4).

The court nonetheless found no conflict in Mr. Joenk's dual role because the

Board had appointed a lead trustee, Gary Schpero (JA42), and Mr. Schpero had

testified that "regulators clearly consider [this arrangement] perfectly appropriate."

(JA42). Mr. Schpero was unclear as to the regulatory authority on which he relied

to endorse Mr. Joenk's dual role. The only regulatory guidance called to the

court's attention was an SEC rule, invalidated on other grounds, that condemned this practice. *See* Investment Company Governance, 69 Fed. Reg. 46378, 46382 2004 WL 170783 (August 2, 2004) (amending 17 C.F.R. § 270) ("We believe that a fund board is in a better position to fulfill the board's obligations . . . when its chairman does not have the conflicts of interest in the role of an executive of the fund adviser.")

Moreover, Mr. Schpero was not an adequate counter-weight to Mr. Joenk. The Board did not undertake to verify information provided by Mr. Joenk or to seek assistance of consultants (it merely reviewed written publications) because the Board, according to Mr. Schpero, had no "concerns about . . . the integrity of [the] information" provided by FMG. (JA5118-JA5119; JA5241).

Mr. Joenk's incentives coupled with Mr. Schpero's quiescence undermined the Board's ability to fulfill its "watchdog" role. In addition, as discussed below, the Board was misinformed and, at times, mislead.

### 2. The Trial Court Erred When it Ignored the Implications of its Finding That FMG Did Not Adequately Account for Allocated Costs Purportedly Incurred by AXA

Between 2009 and 2013, AXA annually allocated between $46.9 and $61.9 million of its expenses to the EQAT funds. (JA101). These costs substantially exceeded the amount, between $7.2 million (2009) and $15.9 million (2013), paid

in fixed expenses to manage and administer the EQAT funds. (JA101).  In 2011

alone, FMG allocated $4,401,745 of AXA's expenses to the EQ/Core Bond Index.

(JA1298).  This amount was greater than the fees this Fund paid to its sub-advisor

($1,125,066) for the performance of day-to-day management tasks.  (JA207;

JA1248).  This allocation facilitated Defendants' efforts to minimize the profits it

reported to the Board and was, for several reasons, flawed.

At trial, Plaintiffs argued that the Board should not have considered AXA's

allocated expenses, nor should the trial court, because:  (1) the cost of AXA's

services were covered by fees paid as part of AXA's direct expenses pursuant to a

separate agreement between FMG and AXA (the "Shared Services Agreement")

and thus AXA's "allocation" was duplicative JA779-JA784; (2) FMG's revenue

based allocation system (JA4859; JA4861; JA1482-JA1488; JA349-JA351) was

flawed - it should have been cost based as Plaintiffs' expert testified (JA349-

JA351; JA4302-JA4306; JA4292-JA4294; JA4426; JA4428-JA4430; JA4288-

JA4289; JA4299; JA4368) or time based as FMG's auditor testified was typical;[3]

(3) the allocation methodology had not been reviewed by an accountant in over a

decade and was no longer valid (JA3952-JA3954; JA351); (4) the allocated

---

[3]FMG's auditor, PriceWaterhouse, testified that mutual fund managers
typically allocate  expenses based on time devoted to a task.  (JA351; JA5654;
JA5656).

expenses were inadequately accounted for and could not be so large (JA113-JA114); (5) it was incumbent upon FMG and the Funds' board to choose an allocation methodology that was most beneficial to the Funds (JA345-JA354; JA776-JA786); and (6) notwithstanding their "watchdog" role, the Board members did not understand the allocation methodology (JA158-JA159; JA5629-JA5630; JA5632-JA5633; JA5314-JA5317; JA315-JA320).

> a.    **Although The Court Found that AXA's Allocated Costs Were Not Properly Accounted For, It Failed to Assess the Ramifications of This Finding**

While the court rejected or ignored most of these arguments, it found that Plaintiffs raised a "valid point that the $49 million in allocated expenses is not adequately accounted for"; "Defendants failed to illustrate how these costs would amount to $49 million"; and "Defendants never quantified [the costs of several of the allocated services], beyond stating that they amounted to $49 million." (JA113-JA114).  The Board nonetheless had accepted this allocation, and the court ignored these findings in its assessment of the Board's level of care and conscientiousness, and in its measurement of FMG's profits.

The court did so because, in its view, it was the responsibility of Plaintiffs, who contended that all allocated costs were subsumed within the Shared Services Agreement, to propose a different allocation than that proffered by Defendants.

(JA100; JA108-JA111). However, it is a "fundamental duty of a trustee to keep accurate and complete records of its administration of the trust." G. Bogert, *The Law of Trusts and Trustees*, § 961 (rev. 2d ed. 1983); A. Scott, *Law of Trusts,* § 172 (3d ed. 1967); *Restatement (Third) of Trusts*, § 83 (a trustee has the "duty to maintain clear, complete and accurate books and records"); *First Nat'l Bank & Tr. Co. of Racine v. Vill. of Skokie,* 190 F.2d 791, 796 (7th Cir. 1951) ("Where there has been a negligent failure to keep trust accounts, all presumptions will be against the trustee upon a settlement; obscurities and doubts being resolved adversely to him.")

Once Plaintiffs satisfied their burden to demonstrate that the allocated costs were not properly accounted for, the burden shifted to FMG to justify those costs. *Nedd v. United Mine Workers of America*, 556 F.2d 190, 210 (3d Cir. 1977), *cert. den.,* 434 U.S. 1013 (1978); *Tatam v. RJR Pension Inv. Committee*, 761 F.3d 346 (4th Cir. 2014). Since FMG did not fulfill that burden, AXA's allocated expenses should have been ignored. *See Krinsk v. Fund Asset Management, Inc.*, 715 F. Supp. 472, 492 (S.D.N.Y. 1988), *aff'd,* 875 F.2d 404 (2d Cir.), *cert. den.,* 493 U.S. 919 (1989) (in that § 36(b) case, the court found the adviser's cost allocation flawed and concluded that "the Court must eliminate the amount of these costs from its calculation of a profitability range.")

**b.    The Board Was Remiss Because it Failed to Require a Quarterly Accounting of Allocated Costs and the Court Erred When it Did Not Address this Argument in Its Assessment of the Board's Care**

The court's opinion failed to address a second argument advanced by Plaintiffs in connection with AXA's allocated expenses. Pursuant to the "Shared Services Agreement," AXA was to provide FMG with "the personnel, property and services reasonably necessary to perform [FMG's] management, administrative and other non-insurance related functions." (JA1673). This agreement required FMG to pay "the actual costs (direct and indirect) and expenses incurred by AXA . . .." (JA110; JA1674; *see also* JA1446). Plaintiff argued that this agreement, required by New York law, covered all of the services provided by AXA, direct and allocated, and the costs associated with those services. The court – for reasons that are not explained – found the description of services included in this agreement ambiguous and its terms to be haphazardly drafted and thus irrelevant to its assessment of AXA's allocated costs. (JA114). However, it was undisputed that the Shared Services Agreement required AXA to submit, within 45 days of the end of each calendar quarter, "a statement of apportioned expenses showing the basis for the apportionment of each item." (JA1674). This was not done. (JA5257). This omission, like the inadequacy of

the accounting for AXA's allocated costs, was ignored in the court's discussion of Board care.

### 3.    The Board Failed to Consider Benefits Which Accrued to AXA and Its Affiliate as a Result of Their Relationship to the Funds

The Supreme Court in *Jones* repeatedly enjoined that all "surrounding circumstances," all "relevant circumstances" must be considered when assessing whether an investment advisor fulfilled its fiduciary duty under § 36(b). *Jones*, 559 U.S. at 339, 344, 347-8. If a benefit to a manager's affiliate is "large and predictable," *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 740 F.2d 190, 194 (2d Cir. 1984), and "could be a factor of sufficient substance to give the Funds' trustees a sound basis for negotiating a lower manager's fee," *Gartenberg*, 694 F.2d 932, it is a "relevant circumstance [to be] taken into account." *Jones*, 559 U.S. at 347. One "surrounding circumstance" to consider is sometimes referred to as a "fall-out benefit." *Id.* at 345, n.5.

All of the Funds were part of AXA's deferred annuity program pursuant to which AXA charged annuity premiums, generally between 1% and 2% of a fund's assets, to each mutual fund investor. (JA1544) These premiums, also called "separate account" fees or "product wrapper" fees, were described in AXA's deferred annuity Prospectus (JA1540-JA1567) under the heading "Charges and

expenses," and include a withdrawal charge, a mortality charge, and an administrative expense charge. (JA1544; JA1561-JA1566).

Plaintiffs argued these income streams were among the "surrounding circumstances," *id.* at 347–8, that should have been taken into account by the EQAT Board and the court. (JA288; JA331-JA333). Defendants disagreed, having informed the Board, and argued to the court, that these payments could not be considered unless they satisfied a contrived "but for" test. (JA123). The opinion concludes that the product wrapper fees need not be considered. (JA131). The Court erred.

The proofs revealed that, until 2006, FMG informed the Board that product wrapper fees which exceeded $200 million annually, were "fall-out benefits." (JA1684). In later years FMG described them as "potential fall-out benefits." (JA1572; JA1578; JA3999-JA4012). In 2007, FMG ceased reporting their value and told the Board that they were not to be considered because they did not satisfy a "but for" causation test. (JA3499-JA4012; JA4996).

However, Defendants admitted that: (a) the "EQAT adds value to AXA through 'Fall-out' impacts" (JA645); (b) "[t]he [EQAT] Trust enhances AXA Equitable's variable insurance business" (JA645-JA646); (c) "variable products don't exist without investment options" (JA646-JA647); and (d) the wrapper fees

are paid directly from the Funds (JA646-JA647; JA1544). ("Charges we deduct from your variable investment options . . . Separate Account [fees]"). Nonetheless, the court declined to consider these payments and ruled that they need not have been considered by the Board.

First, the court ruled that Plaintiffs failed to define "product wrapper fees." (JA124). This ruling is irrelevant to an assessment of whether those fees should have been considered by the EQAT Board.

This ruling was also erroneous. During Plaintiffs' direct case, Mr. Joenk described "product wrapper fees" as the premiums charged by the variable annuities sold to investors as part of the mutual fund investments. (JA3826-JA3827). Mr. Schpero described "product wrapper fees" as "the fees that AXA . . . receives at the insurance level for . . . selling and marketing and making available the annuities and various insurance products . . . ." (JA126). The Prospectus for AXA's variable annuity product, which was admitted into evidence, also described these fees. (See JA646; JA1544; JA1561). Plaintiffs and Defendants defined this term in separate letters requested by the court (JA675-JA680), and the Court described these fees as fees paid on variable (deferred) annuity contracts. (JA124-JA125). Therefore, the court committed clear error when it concluded that this term was undefined.

Second, the court ruled that Plaintiffs did not prove that product wrapper fees were fall-out benefits although the court suggested that the termination fee, described in the prospectus, "could be a fall-out benefit." (JA124, n. 35). The court's decision to ignore, and inferentially allowing the Board to ignore these payments, was wrong. That finding cannot be reconciled with § 36(b) which imposes a fiduciary duty with regard to payments to "any affiliated person of such investment adviser," i.e. AXA. Nor can it be reconciled with *Jones'* admonition that all "surrounding circumstances" be considered. 559 U.S. at 347–8. Even if the calculation of these benefits is "not precise," they should be considered if they "could be a factor of sufficient substance to give the Funds' trustees a sound basis for negotiating a lower Manager's fee." *Gartenberg,* 694 F.2d at 932. Here, Plaintiffs provided precise calculations of the value of these benefits on a fund by fund basis. (JA365-JA374).

Moreover, FMG's views as to the characterization of the product wrapper fees cannot justify its failure to apprize the Board of their magnitude in order to permit the Board to reach its own conclusion as how to best use this information to negotiate a lower fee.  (JA288; JA332-JA334; JA788-JA791). *See Galfand v Chestnutt Corp.*, 545 F.2d at 812 (adviser has "duty to promote responsible directorial judgment by supplying information sufficient to enable the Fund's

2475886.1                                     29

Board to evaluate the new contract 'with an eye eager to discern . . .'").

Finally, even if *Jones'* conception of "surrounding circumstances" is limited to "fall-out benefits," the product wrapper fee is a fall-out benefit. In *Gartenberg,* 694 F.2d at 928, defendants argued that income from non-fund business was not a fall-out benefit and the trial court agreed. The Court of Appeals, in contrast, held that commissions paid to a Merrill Lynch affiliate on trades made by investors buying and selling non-mutual fund securities to the extent quantifiable "should be taken into account in determining whether the Manager's fee meets the standard of § 36(b)." *Id.* at 932. These Merrill Lynch payments were more remote from Mr. Gartenberg's mutual fund investments than are the deferred annuity premiums paid to AXA, and Plaintiffs, unlike the *Gartenberg* plaintiffs, offered evidence of their value for each year.

Some years later the *Gartenberg* court returned to the issue of fall-out benefits. This time defendants argued that interest float and free credit balances (uninvested shareholder assets) should not be considered "fall-out benefits" because they are "voluntary." Rejecting this argument, the court ruled that "[w]e therefore reiterate our prior holding that *all* benefits, including float and free credit balances, are to be considered in evaluating the reasonableness of an advisory fee." 740 F.2d at 194 (emphasis in original).

Neither *Jones* nor *Gartenberg* can be reconciled with the trial court's ruling. The deferred annuity payments withdrawn from Fund assets were large (JA369-JA374; JA1537; JA1672; JA1678; JA1539; JA1680; JA1682; JA1684) and predictable and a "surrounding circumstance" that "could be a factor of sufficient substance to give the Funds' trustees a sound basis for negotiating a lower manager's fee." *Gartenberg*, 694 F.2d at 932. The Board should have considered this information and the court should have addressed Plaintiffs' argument.

### 4.    FMG Provided Misleading Profit Information to The Board

*Jones* provides that one of the factors that may be considered is the "profitability of the fund to the adviser." *Jones* at 345, n. 5. FMG represented to the Board that its profit margin was in line with the profit margins of its competitors. In doing so, FMG misled the Board, and the court did not discuss Plaintiffs' evidence that it did so.

FMG claimed that the profit margin of its competitors was "55 percent," and FMG's profit margin was a nearly equivalent "56.8 percent." (JA4959-JA4960). The 55% profit margin of FMG's competitors was based upon each competitors' audited financial statements. (JA4964-JA4965; JA5035). When reporting its profit margin to the Board however, FMG did not use its audited financial statements. Instead, FMG manufactured its own documents showing a 56.8%

profit margin. (JA4959; JA5034-JA5042). The profit margin reported on FMG's audited financial statements, which was the proper comparison, was nearly 20 points higher, at 75.4%. (JA5034-JA5042). The trial court ignored this evidence.

### 5.    The Board Was Given Misinformation About Comparable Fees

Each year, FMG provided the Board with a report, prepared by Lipper & Co., which purported to compare the fees of FMG's funds to the fees of peer funds. These comparisons compared the fees of the large FMG funds to the fees of a group of far smaller funds. (JA5273-JA5275; JA5277-JA5279; JA2830; JA2818). By way of example, in Lipper's 2013 Expense Report, the fee of the EQ/Intermediate Government Bond Index, which had $7.351 billion in assets, was compared to the fees of 27 other funds with a median size of $955 million. (JA2818). The EQ/Core Bond Index was four times larger than the median fund to which it was compared (JA2822). The EQ/Common Stock Index was 13 times larger than the median fund to which it was compared (JA2825-JA2826) and the EQ/Equity 500 Index was 3 times larger than the median fund to which it was compared. (JA2829-JA2830).

Fees charged on smaller funds will exceed fees charged to manage larger funds. (JA1818; JA5443-JA5445). A Securities and Exchange Commission study revealed that fees on smaller funds are considerably higher than fees charged by

advisers to funds with $1 billion in assets. (JA1833). An industry publication

used by the Board, Strategic Insights, warned that it was misleading to compare

the fees of a large fund to those of a small fund:

> The use of 'simple mathematical averages,' which equate the fee ratios of
> the many thousands of tiny expensive funds that hardly anyone owns, with
> the lower fees among few hundred funds that control most fund assets, is
> inappropriate, misleading and irresponsible.

(JA3695). The Board and the trial court ignored this admonition.

When making fee comparisons, *Jones* recognized that the weight to be

afforded to fee comparisons depends upon the similarities and differences in the

services provided. *Jones* at 349-50. (JA131). With the exception of the

EQ/Equity 500 Index Fund, the Lipper data compared the fees on FMG's index

funds to the fees of actively managed funds. (JA5272-JA5275). Defendants' fee

expert acknowledged that fees on actively managed funds will exceed fees on

passively managed funds. (JA5437-JA5438). According to the SEC, fees on

index funds are generally less than fees on actively managed funds (JA1819;

JA1834), and fee comparisons between index and active funds are misleading. *In

the Matter of Commonwealth Management LLC*, Release No. 31678, 2015 WL

3760794 (SEC, Aug. 8, 2017). The court did not address this deficiency in the

Board's process.

**6.    The Trial Court Found That The Board, in Later Years, Made Improvements And the Court Recommended Others But The Court Did Not Consider This Evidence in its Assessment of the Board's Level of Diligence**

Among other things, the court found that "Plaintiffs' lawsuit resulted in a more scrupulous and rigorous examination of Board expenses."[4] (JA142). However, the court did not separately analyze whether, prior to this lawsuit, the Board process was adequate.

In addition, the court did not address a significant omission in the Board material. As the court found, the Board's lead trustee had testified to "the importance of approving FMG's fees and ensuring . . . that the fee . . . is reflective of services [FMG] provides separate and apart from the services the sub-advisor provides." (JA142; JA5133). The court referred to charts which "'gather information' very specific to the amount of fee" that FMG retains. These charts revealed that FMG retained 95% of the total fee on the two fixed income index funds and approximately 80% of the total fee on the two equity funds – far more than the industry average for fixed income (66%) and equity (52%) funds and

---

[4]The Board twice spent $25,000 of investor money on each of two dinners to entertain FMG for a "job well done." (JA141-JA142). Rather than assess the impact of these expenditures on the Board's understanding of its fiduciary responsibilities, the Court relegated this misconduct to a "transparency issue." (JA142, n. 37).

more than the EQAT average retention (68.4%) (JA2855-JA2857). "However,"
the court found that "this seemingly indispensable breakdown of fees was not
provided to the Board until 2013, two years after the suit was filed." (JA142).

## D.    Other Fund Boards Have Engaged in a Far More Rigorous Process When Evaluating Adviser Compensation

The processes employed by fund boards in reported cases have been far
more rigorous than that of the EQAT board. *Compare Schuyt v. Rowe Price Prime
Reserve Fund, Inc.*, 663 F. Supp. 962, 985-87 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d
Cir. 1987) (the fund's board annually retained an independent accountant to
review the advisor's cost allocation methodology, required that the cost allocation
methodology be redone, postponed consideration of some fee approvals, and
"actively bargained to obtain a better deal for the Fund"); *Kalish v. Franklin
Advisers, Inc.*, 742 F. Supp. 1222, 1243 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d
Cir.), *cert. den.*, 502 U.S. 818 (1991) (the fund board retained its own consultant
to undertake a formal written analysis of the nature and extent of services provided
to the fund by the investment adviser as well as the adviser's fees, costs, expense
allocation, profitability and performance); *Gartenberg v. Merrill Lynch Asset
Management, Inc.*, 528 F. Supp. 1038, 1056-64 (S.D.N.Y. 1981) (the board was
fully informed about the scope of services rendered by the adviser, received

written reports weekly, as well as detailed cost data and information about the costs of retaining other advisers, data about the value of the advisory relationship to the adviser's parent; the Board considered the bargaining power generated by the fund's size, and received an opinion from counsel on the impact of collateral costs incurred by the parent as well as a study of processing costs.)

The EQAT Board, chaired by FMG's Chief Executive Officer, took none of these steps because FMG

> appears to have ignored completely [its] duty to promote responsible directional judgment by supplying information sufficient to enable the Fund's Board to evaluate the new contract "with an eye eager to discern . . . rather than shut against" the interests of AIF.

*Galfand v. Chestnutt Corp*, 545 F.2d at 812.

**E.    This Case Should Be Remanded to Allow the Trial Court to Re-calibrate the Level of Deference to Be Afforded to the Board's Decisions**

These deviations in Board process are relevant to two aspects of this appeal. Had the trial court properly considered the impact of even a single one of these flaws, the court's conclusion with regard to the deference to be extended to the Board's decisions might well have been different. Therefore, irrespective of how the trial court may have evaluated Plaintiffs' substantive evidence, this matter should be remanded to allow the court below to re-calibrate the level of deference to be afforded to the Board's decision and to reconsider its ultimate conclusion.

*Cf. U.S. v. Mead Corp.*, 533 U.S. 218 (2001) (remanding to permit trial court to determine level of deference). Even were this matter not remanded, the flaws described above require a "more rigorous look" at the outcome and "greater scrutiny," as discussed in Point III below.

## POINT II

## THERE WAS EXTENSIVE EVIDENCE IN THE RECORD OF THE FEES RECEIVED BY FMG FOR MANAGEMENT AND ADMINISTRATION

In its assessment of FMG's fees, the trial court properly undertook to separate the services provided by FMG from those provided by the sub-advisors and JPMorgan. (JA57-JA100). The court found, however, that it could not determine whether the compensation paid to FMG was disproportionate to services rendered by FMG because Plaintiffs did not elicit evidence of the compensation which FMG was paid relative to that of the sub-advisors and JPMorgan (i.e. FMG's "retained fee" or the "net fee.") (JA69-JA71). Therefore, the court seemed to be saying it could not determine if FMG's fees were disproportionate to the services it rendered.

Implicit in the court's finding is the recognition that FMG did not provide the Board with information that compared its services and compensation to those of the sub-advisors and JPMorgan, which is a significant omission on the part of

FMG. It thus fell to Plaintiffs to undertake these calculations. Plaintiffs did so and the results of these calculations were set forth in Tables 2 ("Retained Management Fee") and 3 ("Retained Administration Fee") (JA267-JA271) in Plaintiffs' Proposed Findings of Fact. The court declined to consider those tables because it did not believe that the underlying data was in the record and because of what it perceived as inconsistencies between those tables and Dr. Pomerantz's testimony. (JA71). The court's decision in that regard was, for several reasons, clearly erroneous.

**First**, the retained fee analyses for each Fund for each year were done by Kent Barrett, Plaintiffs' accounting expert, and his 14-page analysis was admitted into evidence as P-197f (JA1656-JA1670). Mr. Barrett explained how he performed this calculation, using information provided by FMG. (JA4260-JA4272). Defendants did not contest the accuracy of his calculations and the court overlooked this exhibit.

The numbers in Plaintiffs' Table 3, the "Retained Administration Fees" (JA269-JA271), correspond to those in Mr. Barrett's chart, P-197f (JA1656). The only differences, which are less than $500, are due to rounding. In footnote 20 of its opinion (JA69), the Court acknowledges that there is no discrepancy in the administrative fee calculations.

Mr. Barrett also computed the retained management fee. (JA4261). The numbers in Table 2 of Plaintiffs' Proposed Finding of Fact, "Retained Investment Management Fees," for the EQ/Core Bond Index and the EQ/Intermediate Government Bond Index, are identical to those reported by Mr. Barrett in P-197f (JA1656), save for rounding.

Mr. Barrett's calculation of the retained management fee for the EQ/Common Stock Index and the EQ/Equity 500 Index differed from those in Table 2. By way of example, in 2012, Mr. Barrett found that the retained management fee for the EQ/Common Stock Index was $8,356,000 (JA1659), while Table 2 used a smaller number: $8,082,177 (JA267). For that same year, Mr. Barrett reported a retained management fee for the EQ/Equity 500 Index of $6,375,000 (JA1661); Table 2 used a slightly larger number: $6,378,516 (JA267).

These variances for the two equity funds for a few years are irrelevant to the calculations for the two bond funds; they are not meaningful for purposes of making the disproportionality assessment and they are easily explained. Mr. Barrett considered something called the "Alliance Contribution," which impacted only the EQ/Common Stock Index Fund and the EQ/Equity 500 Index Fund. The "Alliance Contribution" refers to the sub-advisory fee paid to AllianceBernstein, FMG's affiliate, discussed as a "fall-out" benefit at pages 26-31 above. (JA3932-

JA3933).  Depending upon the year, this adjustment increased or decreased

FMG's management fee.

Table 2 does not include that adjustment in the calculation of the retained

fee because when Mr. Joenk testified as to how to compute the retained fee (see

pp. 40-41 below), he characterized the "alliance contribution" (i.e the profit earned

by FMG's affiliate, AllianceBernstein), as a fall-out benefit.  (JA3933-JA3944).

Plaintiffs accepted this testimony when they prepared Table 2 and did not count

the AllianceBernstein fees as part of FMG's fees, as it would have been

duplicative to treat the payment to AllianceBernstein as both fee income and a

fall-out benefit.

The amount is, in any event, not of sufficient magnitude to have impaired

the court's effort to assess whether or not the portion of the management fee

retained by FMG for these two funds was disproportionate to the services

provided by FMG.  Thus, with modest exceptions with regard to the management

fees for two funds, the data in Tables 2 and 3 are based on Mr. Barrett's admitted

tables, and Defendants did not point to a single error in the tables.

**Second**, as noted above, Mr. Joenk testified how the retained fee is

calculated using FMG's annual "Management, Administration and Distribution

Profitability" reports. (*See* JA3973-JA3977). These reports were admitted as P-50,

P-51a, P-51b, P52a, P-52b, P-53a, P-53b, P-53c, P-54a, P-54b and P-54c. (*See* JA1269-JA1385). Mr. Joenk explained that FMG's retained fee for any of the funds could be calculated from these exhibits by subtracting the "Sub-Advisor'[s] Fees" and the "Product Cap Reimbursements" (reimbursements made from variable annuity premiums) from the "Management Fees," all as specifically identified in FMG's annual report for each Fund (JA3975; JA1298). Plaintiffs replicated this process in Table 2 of their Proposed Findings of Fact. (JA267-JA269).

**Third,** even if the court disagreed, all of the underlying data needed to make these calculations was admitted as part of the "Management Administrative and Distribution Profitability" reports discussed above. Plaintiffs did the subtractions in the manner described by Mr. Joenk as an aid to the court. If the court felt the calculations were wrong, it was required by FED. R. CIV. P. 52(a)(1) to make its own findings.

Defendants identified no errors in Table 2 and 3; they only argued that the concept of "retained fee" was not included in FMG's documents. (JA407-JA411). That is correct because the "retained fee" is simply a descriptive term used by Plaintiffs to refer to a difference calculated by Mr. Barrett and replicated in Plaintiffs' Findings.

The court justified its failure to consider this information on several grounds. Among them, the court noted that Dr. Pomerantz did not do retained fee calculations for 2010, 2011, 2013 and 2014. This omission is of no consequence because Mr. Barrett did the calculations for all Funds through 2012. (JA1659-JA1661; JA1666).

In addition, the court commented upon what it perceived as discrepancies in Dr. Pomerantz's work. It noted that, for the Common Stock Index Fund in 2012, Table 2 of Plaintiffs' Proposed Findings of Fact revealed that FMG retained "$8,082,177," while Dr. Pomerantz found a "retained" management fee in his P-151a of "$11,870,399." (JA69-JA70). The "difference" (JA70) is not a mathematical error. Table 2 in Plaintiffs Proposed Findings of Fact, as the name makes clear, is FMG's "Retained Investment Management Fees." (JA407-JA410). Conversely, Dr. Pomerantz's P-151a, as its title reflects, presents a "Comparison of FMG's Investment Management Fees to Sub-Adviser's Fees." (JA1626). As Dr. Pomerantz testified, he simply computed the difference between the two fees (JA4468-JA4473), which was a different calculation.

Finally, while the court correctly noted that none of Plaintiffs' experts computed the retained fees for 2013 or 2014 (JA70), that was because the underlying data was not provided by Defendants in discovery before experts'

reports were prepared. Tables 2 and 3 employ Mr. Joenk's methodology for both years and should have been considered by the court.

In sum, the purpose of the retained fee analysis was to allow the court to assess whether FMG's compensation was disproportionate to its services. Precision was not critical to this analysis. Moreover, a parties' proposed findings of fact are merely suggestive. 9C Charles Wright, Arthur Miller & Alan Kane, *Federal Practice and Procedure (Civil)* § 2578, p. 351 (3d edn. 2008); *Norwest Bank Minnesota v. Blair Road Associates, LP*, 252 F. Supp. 2d 86, 89 (D.N.J. 2003). Even if the entries for two Funds in Plaintiffs' tables – for management fees only – were inaccurate, the court was not relieved of its responsibility to make findings if there was sufficient information in the record to do so. *See In re Las Colinas, Inc.*, 426 F. 2d 1005, 1009 (1st Cir. 1970). Based on Mr. Joenk's testimony and the admitted exhibits, there was sufficient information to allow the court to make its own calculations. Tables 2 and 3 were Plaintiffs' effort to assist the court. The tables were not inaccurate, nor were they based on unadmitted data.

## POINT III

**EVEN WERE THE COURT TO DEFER TO THE DETERMINATION OF THE BOARD TO APPROVE FMG'S COMPENSATION, THAT COMPENSATION DOES NOT HAVE THE EARMARKS OF AN ARM'S LENGTH BARGAIN**

Even if a fee is approved by a well-informed board, "a fee may be

excessive" if it is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Jones* at 351. This Point examines the substantive component of the *Jones* analysis which contemplates, among other evidence, consideration of the *Gartenberg* factors discussed at pages 11-12 above. These issues must be reviewed *de novo* since they involve the application of law to facts. *American Soc.*, 478 F.3d at 566.

Before turning to a discussion of the *Gartenberg* factors, it is important to note that a critical error permeates the court's opinion. That error derives from the failure of the court to perform a separate § 36(b) analysis for each Plaintiff Fund for each year in the damage period. Each Fund presented an independent claim asserting that FMG breached the fiduciary duty it owed to that Fund. Thus, it is axiomatic that the court should have performed a fund-by fund analysis of the compensation received from each Fund for the services provided to that Fund. This error is compounded by the court's failure to make specific findings of fact and conclusions of law on a fund by fund basis as required by FED. R. CIV. P. 52(a)(1). *See In re Frescati Shipping Co.,* 718 F.3d 184 (3d Cir. 2013) (because district court did not make separate findings of fact and conclusions of law as required by Rule 52(a)(1), case had to be remanded; in interest of efficiency, court

of appeals discussed and made holdings on legal issues despite inevitable remand).

Thus, this case should be remanded but only after the court resolves disputed legal

issues. *Id.* That aside, the trial court erred in its substantive analysis.

## A.    Nature and Quality of Services (JA57-JA100)

### 1.    FMG Performed Minimal Services, at a Small Cost, Using Few Employees

Under the Investment Company Act, an "investment adviser" is

(A) any person (other than a bona fide officer, director, trustee,
member of an advisory board, or employee of such company, as such)
who pursuant to contract with such company **regularly furnishes
advice to such company with respect to the desirability of
investing in, purchasing or selling securities or other property, or
is empowered to determine what securities** or other property shall
be purchased or sold by such company, and (B) any other person who
pursuant to contract with a person described in clause (A) of this
paragraph regularly performs substantially all of the duties
undertaken by such person described in said clause (A) . . ..

15 U.S.C. § 80a-2(A)(20)(A) (Emphasis added).

The relevant sub-advisory agreements conferred the responsibility to

"regularly" perform the advisory role on the sub-advisors.  (JA820-JA821; JA855-

JA856).  Consistent with the sub-advisory agreement, FMG represented to the

SEC that day-to-day management of the index funds fell to the sub-advisors.

(JA1248; JA1490-JA1491; JA1512; JA1519).  FMG also acknowledged that it

"delegated the day-to-day accounting and fund administration functions to

JPMorgan . . . ." (JA1250). As JPMorgan's representative testified, the services outlined in the Sub-Administration Agreement were the "full services for a full service client." (JA5760-JA5762; JA906-JA909).

It is undisputed that FMG and AXA performed services in addition to those delegated to the sub-advisors and JPMorgan. Several of these services were described in detail in the court's opinion at JA75 to JA83. However, the evidence showed that many of the services described by the court had no relevance to the index funds. For instance, the index funds had no exchange traded funds. (JA4105; JA4114). They did not employ AXA's tactical management risk strategy. (JA7130; JA4058-JA4059). There was no allocation of assets within the index funds because the investments were determined by the relevant index (JA3853-JA33854; JA4104-JA4105) and there was no need to rebalance among multiple sub-advisors because each index fund had one sub-advisor. (JA4112-JA4113; JA1730).

Whatever tasks FMG did perform, they were done, according to reports which FMG filed with the SEC, with a staff of 10 investment managers and 46 other employees (JA952) servicing 120 funds. (JA4103). The labor demands were slight. By way of comparison, Ssga, the sub-adviser to the EQ/Core Bond Index Fund and the EQ/Intermediate Government Bond Index Fund, used 17

employees to manage 4 of the 120 funds managed by FMG (JA3138; JA3141-JA3142), and received a fraction of the fee (see e.g. JA3973-JA3975; JA1295-JA1303). Even assuming the validity of AXA's $49 million expense allocation, all of FMG's and AXA's services cost approximately $500,000 per fund.[1]

## 2. The Quality of the Service Provided to the Funds Was Poor (JA134-JA141)

The court ignored the most significant measure of fund performance evaluated in the case law, namely, Lipper peer group comparisons. Three of the four index funds performed abysmally.

FMG provided Lipper rankings to the EQAT Board for each fund for three and five year periods. (JA5801; JA3884). Defense expert, Dr. Russell Wermers, acknowledged that it is industry standard to use Lipper peer groups comprised of similar funds to evaluate performance (JA5583-JA5584), and that long term results are the preferred measure of performance. (JA5610).

For every year, 2010 through 2014, Lipper placed the EQ/Core Bond Index, the EQ/Intermediate Government Bond Index and the EQ/Equity 500 Index in the fourth (worst) performing quartile for the three and five year periods. Only the

---

[1]FMG's expenses excluding the sub-advisory fees paid by the funds (JA3852) were roughly $13 million (JA1446). AXA's (contested) allocated expenses were roughly $49 million. If the total expenses paid by FMG and AXA were allocated among the 120 funds which FMG managed, the average cost incurred by Defendants per fund was approximately $500,000.

EQ/Common Stock Index performed in line with its peers. (JA3887-JA3890;

JA5801 (2010); JA1408 (2011); JA1406 (2012); JA1397 (2013); JA1395 (2014);

JA1415). For the three and five year periods ending 2012, FMG classified these

three funds as "Perennial Underachievers." (JA5802). The court, however,

concluded that the funds performed above expectations. (JA136-JA137).

The Court erred when it ignored the Lipper performance comparisons

because case law almost uniformly measures performance against peers. *See e.g.*

*Gartenberg*, 573 F. Supp. 1293, 1300-1301 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190

(2d Cir. 1984) (fourth best performance among 14 prime money market funds; in

1982, fund had the seventh best performance among 51 comparable funds); *Kalish*

*v. Franklin Advisers*, 742 F. Supp. at 1229-30 (highest return out of mutual funds

with $5 billion or more in assets under management); *Krinsk v. Fund Asset*

*Management*, 715 F. Supp. at 487-88 (consistently performed at or near the top

compared to more than 100 comparable funds); *Schuyt v. Rowe Price Prime*

*Reserve Fund*, 663 F. Supp. at 976-77 (among the best performing funds of its

class); *Gallus v. Ameriprise*, 497 F. Supp. 2d 974, 977 (D. Minn. 2007) *rev'd*, 561

F.3d 816 (8th Cir. 2009), *remanded*, 599 U.S. 1046 (2010) (performed in first or

second quartile of comparable funds).

**B.     The Profitability of the Funds Was Excessive (JA100-JA115)**

*Jones* contemplates consideration of "the advisers'-managers' cost in

providing the services . . .," *Jones,* at 344, as well as "the profitability of the fund

to the advisers." (*Id.* at 345, n.5). The evidence with regard to these factors fell

into three categories: the adviser's cost, the dollar profit on each fund, and the

profit margin (profit divided by revenues) for each Fund.  See profit margin data at

page 63.  The proofs implicated two legal issues: (1) whether it was appropriate to

consider AXA's allocated costs when computing FMG's costs, profit and profit

margin; and (2) whether it was appropriate to treat sub-advisory and sub-

administration expenses paid by the Funds as an expense of FMG when computing

FMG's profit margins.  Since Plaintiffs discussed allocated costs at pages 21 to 26

above, this portion of the brief addresses only the treatment of sub-advisory and

sub-administration expenses.

Defendants sought to minimize its profit margin by improperly counting as

its own expense, sub-advisory and sub-administrative fees paid from the Funds'

assets, through the Funds' checking accounts, to the Funds' sub-advisors and

JPMorgan (JA102; JA3853).  Plaintiffs argued that these costs were not an

expense of FMG.  The resolution of this issue did not impact the calculation of

FMG's absolute dollar profit but it did impact how FMG computed its profit

margin because treating these payments as an FMG expense suppressed the

calculation of that margin.  If allocated costs are omitted from the profit

calculation and sub-advisory and sub-administration fees are appropriately treated

as EQAT's expenses, the management profit margin reached 90% for some Funds.

If sub-advisory and sub-administration fees are treated as FMG expenses, the

profit margin for each Fund is generally at 80% (see page 63 below and

JA1283-JA1286; JA1305-JA1308; JA1363-JA1365; JA1368).

The court concluded that sub-advisory and sub-administration fees were an

expense of FMG based on:  (1) Mr. Joenk's testimony that, if a sub-advisor is

terminated, FMG must pay their fee for 30 to 60 days; (2) Mr. Schpero's testimony

that "industry accounting practice **did not require** that these expenses be noted as

reduction in revenue" (emphasis added); and (3) the testimony of Defendants'

expert, William Holder, C.P.A., that FMG's auditor treated these payments as an

FMG expense.  (JA102-JA103).

The court erred for several reasons.  First, the court's finding that FMG

must pay a termination fee was clearly erroneous.  The Sub-advisory Agreement

states that the agreement may be "terminated without the payment of any penalty."

(JA823-JA824; JA861-JA862).  It does provide for a 60 day notice period.

However, during this period; the EQAT, not FMG, pays these fees.  (JA823-

JA824; JA861-JA862).

Second, once the Court accepted Mr. Schpero's testimony that there was no "required" industry practice (JA102-JA103), the manner in which to treat these payments should have been informed by equitable principles. Under general trust law, considered in *Jones* and *Pepper*, it was a breach of fiduciary duty for FMG to reduce its profit margin by treating sub-advisory and sub-administration fees, which it did not pay, as its own expenses. As the Supreme Court held in *Pepper*, 308 U.S. at 311, a fiduciary

> cannot use his power for his personal advantage and to the detriment of the stockholders . . . no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandisement (sic), preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis*. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.

It was in the interest of fund investors to treat expenses paid by the Funds as Fund expenses, and not to allow FMG to treat those expenses as its own. Treating these expenses as FMG expenses had one purpose: to advance FMG's argument for a higher fee.

Third, while Mr. Holder did testify that sub-advisory and sub-administration fees are included in FMG's audited financial statements, that is irrelevant. There was no testimony from FMG's auditors as to why these payments were treated in

this manner.  Moreover, accounting methods must yield to economic reality.

When evaluating compensation under § 36(b), a court should not "exalt form over

substance."  *See Gartenberg*, 694 F.2d at 931; *Tcherepnin v. Knight*, 389 U.S. 332,

336 (1967); *Frank Lyon Co. v. United States*, 435 U.S. 561, 577 (1978)

("accounting methods or descriptions, without more, do not lend substance to that

which has no substance"); *In the Matter of Smith Barney Fund Management, LLC*

*and Citigroup Global Market, Inc.,* SEC File No. 3-11935, 2005 WL 1278368, ¶

61 (May 31, 2005) (it is misleading to include expenses of sub-transfer agent in

transfer agent's profit margin calculation.)

There was no justification for FMG, a fiduciary, to treat as its own expense,

fees paid to sub-advisors and JPMorgan from the EQAT's assets, from an EQAT

account, to a contractual agent of the EQAT.  The court erred as a matter of law.

## C.    Fall-out Benefits (JA122-JA131)

Payments to AXA as a result of its relationship to the mutual funds are

discussed at pages 26 to 31 below and will not be repeated here other than to note

that the court did not decide whether annuity premiums qualify as fall-out benefits.

(JA121, n.34).  The legal issue should be decided *de novo*.

## D.    Comparative Fees (JA131-JA134)

In its discussion of comparative fees, the court found that the opinion of

Plaintiffs' experts, Dr. Pomerantz and Dr. Kopcke, were not convincing insofar as they concluded that FMG's fees did not reflect an arm's-length transaction. (JA4688-JA4709).   The court found that the opinion of Defendants' expert, Christopher James, to the effect that the funds' fees are at about the median of the industry, was credible.  (JA133).

First, the court erred when after finding Plaintiffs' economics expert, Richard Kopcke, Ph. D., credible, it afforded his testimony little weight "due to his lack of direct experience managing mutual funds." (JA31).   Dr. Kopcke, holds a Ph. D from Harvard University in economics and is a chartered financial analyst. (JA4628-JA4634).   In his work for the Federal Reserve, he has performed financial modeling of mutual funds and has studied mutual fund pricing and fee structures,  including funds using sub-advisors and sub-administrators.  (JA4632; JA4635-JA4641).   Dr. Kopcke has published papers examining the cost structure of mutual funds, including advisory costs and administrative costs.  (JA5808-JA5809).   He has done consulting for the Center for Retirement Research at Boston College where he is presently employed.  (JA4648).   He has taught courses involving mutual funds and insurance companies, he has written articles on financial markets, and he has engaged in portfolio management.  (JA4628-JA4645).   At trial, the court concluded that Dr. Kopcke had "more than significant

knowledge to allow him to be an expert in this case." (JA4652). Yet, in its opinion the court minimizes the Doctor's expertise. (JA31).

Defendants' economics expert, upon whom the court relied (JA133), was a professional witness who claimed to spend 10% to 15% of his time studying issues related to mutual funds and served as an expert in real estate, products liability, pharmaceutical and bankruptcy matters. (JA5403-JA5405).

Second, it was error for the court to rely on the Lipper expense data. The Supreme Court has held that comparisons between the adviser's challenged fees and fees charged to mutual funds by other advisors is "problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length" and that the weight to be afforded to the fee comparison is dependent upon "the similarities and differences" between the services provided. *Jones*, at 349-51.

The court's analysis ignored this admonition. With the exception of the EQ/Equity 500 Index Fund, Lipper compared the fees of its index funds to the fees of actively managed funds. (*See* pp. 32-34 above JA5275). Moreover, as discussed above, the EQAT Funds were invariably much larger than those to which they were compared. As Defendants' expert testified, and as SEC has found, larger funds have lower fees than funds with less assets. (*See* JA1816-

JA1834; JA5443-JA5445 and pp. 32-34 above). The Lipper data was not probative.

Third, the court failed to address Plaintiffs' challenges to the opinions of Dr. James. Dr. James did not segregate his comparison group by fund size. (JA5448). In addition, he only looked at the total fee (JA5428), which is inappropriate in a § 36(b) case challenging one fee component. *See Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990); *Pfeiffer v. Integrated Fund Servs., Inc.,* 371 F. Supp. 2d 502, 508 (S.D.N.Y. 2005).

Even with all of these flaws, Dr. James' analysis, with one exception, supports Plaintiffs' position. He admitted on cross-examination that his data revealed that the total fees for the EQ/Core Bond Index Fund (46.5 bps for EQ/Core Bond Index Fund; 40.4 bps for median index fund), the EQ/Equity 500 Index Fund (37.4 bps for the EQ/Equity 500 Index Fund; 29.1 bps for the median index fund) and the EQ/Common Stock Index Fund were more expensive than nearly four out of five comparable funds. (JA5465-JA5466). Dr. James' analysis of the fee for the EQ/Intermediate Government Bond Index was not meaningful: He compared its fee to the fees of only two other index funds, and found a median fee of .851%. (JA5475). This median fee exceeded the highest fee (.747%) reported by Lipper among the 17 funds it examined in that same year. (JA2817;

JA5467-JA5469).  This discrepancy was unexplained by Dr. James.  (JA5464-

JA5466).

A review of fee comparisons undertaken in reported cases reveals that

comparisons were made to funds of "similar objective and size"; and that the fees

that were at issue in those cases were low compared to their peer groups.  *Kalish*,

742 F. Supp. at 1230 (Franklin fund had among the lowest expense ratios of 13

funds of similar objective and size); *Krinsk*, 715 F. Supp. at 497, n.50 (fund was

the 3rd least expensive fund among 138 taxable money market funds and ranked 11

out of 48 retail money market funds with assets of $500 million); *Schuyt*, 665 F.

Supp. at 970 n.30 (fee was at "low side of the money market fund industry");

*Gallus*, 497 F. Supp. 2d at 976-77 (fees at or below the Lipper median).

## E.    Economies of Scale (JA115-JA122)

Plaintiffs' experts testified that FMG failed to share economies of scale

(JA4501-JA4506; JA4715-JA4718), but the Court rejected that testimony.

(JA119).  Given the small amount of FMG's operating expenses, economies of

scale were of little consequence and Plaintiffs do not here address the Court's

determination.

## F.    Conclusion

Thus, even were this Court to find that the Board was careful and

conscientious and that the court did a fund by fund analysis, FMG's compensation is unlawful because it is disproportionate to the services it rendered. FMG used few resources to service the Funds. The Funds, with one exception, performed poorly. FMG earned extraordinary profits, incurred small costs, benefitted from collateral payments to AXA, and its fees exceeded those of its competitors.

## POINT IV

## THE COURT ERRED IN ITS TREATMENT OF DAMAGES

While actual damages in a § 36(b) case are measured as the difference between the fee paid and a fair fee, *In re Evangelist*, 760 F.2d 27 (1st Cir. 1985), no reported opinion explains how a "fair fee" is to be calculated. Plaintiffs proposed several alternative approaches. (JA375-JA403).

The first approach (Damage Model 1), which was based on disgorgement, is based upon the language in *Pepper*, 308 U.S. at 397, that an unlawful fee will be set "aside." In a case brought under § 36(b), a plaintiff has the burden "of proving a breach of fiduciary duty." 15 U.S.C. § 80-35(b)(1). However, § 36(b) does not address which party has the burden of proof on the quantum of damages. In breach of fiduciary duty cases, once plaintiff fulfills its burden to prove misconduct, the duty to separate lawful from unlawful profits shifts to the breaching fiduciary. *See e.g. Leigh v. Engle*, 727 F.2d 113, 138 (7th Cir. 1984)

(an ERISA case against an investment fiduciary in which the court held that the breaching fiduciary had the burden to apportion its profits between those that were lawful and those that were not). It was incumbent upon Defendants to proffer evidence on the "actual damages resulting from the breach of fiduciary duty." § 36(b). Since Defendants did not fulfill their burden, Plaintiffs were entitled to disgorgement. The court did not address this legal argument.

In addition, Plaintiffs offered several alternative methodologies to compute damages. At the time a party prepares proposed findings of fact, it could not be expected know how the court will resolve issues. *See* discussion in *Roberts v. Ross*, 344 F.2d 747, 751 (3d Cir. 1965) *abrogated on other grnds., Lansford-Coaldale Joint Water Authority v. Tonolli Corp.*, 4 F.3d 1209, 1214 n.5 (3d Cir. 1993). This is especially problematic in a case involving 12 mutual funds which charged fees over several years involving unknowns as to: (1) how AXA's allocated costs would be treated; (2) how sub-advisory and sub-administration fees would be treated; (3) how a reasonable fee is to be calculated; (4) what profit margin reflects an "arm's-length" bargain; and (5) what damage model the court might embrace. Therefore, Plaintiffs proffered four alternative models to calculate damages, separately for management and administrative fees for each Fund for each year.

Each of those models is discussed in detail in JA375-JA403. The general methodology which Plaintiffs used was explained by Dr. Pomerantz, who calculated damages for all funds using a variety of hypothetical profit percentages ranging from 39% to 90%. (JA384-JA400; JA4514-JA4528, *see* charts at JA1628-JA1632).

Damage Model 2 was based on the 59.57% profit margin that Defendants represented to the Board as its profit margin. (JA383-JA394; JA3677). This 59.57% profit margin was applied individually to each of the Funds each year under several different scenarios depending upon how the court chose to treat sub-advisory and sub-administration fees and/or allocated costs. (JA383-JA394). The results of that arithmetic calculation were explained and shown in separate tables, and each number (revenues, expenses, etc.) was tied to an exhibit admitted into evidence.

Damage Model 3 was based on a 39% average profit margin which was the profit margin over the last 5 years reported in data from an admitted Strategic Insights report provided by Defendants to the Board. (JA394-JA400; JA1638; JA3995-JA3996). Plaintiffs undertook the same analyses that they used in Damage Model 2, with the result depending on how the court might determine to treat sub-advisory fees, sub-administration fees and/or allocated expenses.

Damage Model 4 computed the damages for each Fund for each year as the difference between the compensation which resulted from the fee which FMG charged and the compensation which resulted from the average expense ratio reported in an admitted report authored by the Investment Company Institute. (JA401-JA403; JA1526).

The court found these proposals flawed because: (1) Plaintiffs' damage tables, which were included in their Findings of Fact and summarized arithmetical calculations based on admitted documents, could not be considered because the tables themselves were not admitted; (2) Plaintiffs presented no evidence as to what would be a "fair fee;" (3) comparisons of FMG's fees to low cost providers like Vanguard was improper; (4) Plaintiffs failed to consider sub-advisory fees, sub-administration fees and allocated costs in their damage model.

Several principles should inform the Court's review of these determinations. First, the trial court overstates the burden placed upon Plaintiffs. Proposed findings "submitted by counsel are no more than informal suggestions for the sole purpose of assisting the court." Wright, Miller & Kane, *supra*, § 2578, p. 351; *Norwest Bank Minnesota*, 252 Fed. Supp. 2d at 89. Thus, damage models drawing upon data included in admitted evidence are not objectionable.

Second, even if the court believed Plaintiffs Proposed Findings were

deficient, the court was not relieved of its duty, under FED. R. CIV. P. 52(a)(1), to make its own findings on damages provided the record contained a non-speculative basis for doing so. *Traylor v. U.S.,* 396 F.2d 837, 839 (6th Cir. 1968) (in bench trial, Rule 52(a)(1) requires court to find damages). There is no legal requirement that damages be calculated by a trial witness as a condition of an award. It is clear in this Circuit that Plaintiffs need only furnish evidence by which the fact finder may assess damages. *Scully v. US WATS, Inc.,* 238 F.3d 497, 515 (3d Cir. 2001) ("all that is required is that 'sufficient facts . . . be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture.'") In *Scully,* this Court affirmed a damage award in a bench trial when the district court rejected both parties' suggested methods for calculating damages in favor of a damage calculation of the court's own creation.

Third, a methodology of calculating damages need not be precise; it may be "approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 565 (1931) (fact that "damages [cannot] be measured with certainty by a fixed rule" does not absolve the fact finder of the duty to make a damage assessment.) This is so because:

> There is no sound reason . . . for throwing any part of the loss upon the injured party, which the jury believe from the evidence he has sustained; though the precise amount cannot be ascertained by a fixed rule, but must be matter of opinion and probable estimate. And the adoption of any arbitrary

rule . . . would be little less than legalized robbery.

Each of the court's objections to Plaintiffs' damage models is flawed. First, Plaintiffs' post-trial charts merely performed arithmetical calculations based on FMG's financial records which had been admitted into evidence. (JA1269-JA1281; JA1295-JA1303; JA1317-JA1322; JA1347-JA1357; JA1378-JA1385). Second, as the court in *Leigh*, 727 F.2d at 138, recognized, "a precise calculation of damages is virtually impossible" in an investment loss case and it may be necessary to use uncertain measures. This is especially so here because Plaintiffs could not propose a "fair fee" without knowing how the court would treat FMG's claimed expenses. It is unclear why the court criticized the use of low cost providers, such as Vanguard, given the small costs incurred by FMG. Finally, Plaintiffs' models did consider sub-advisory fees, sub-administration fees and/or allocated costs.

## Management, Sub-Advisory, Administration and Sub-Administration Compensation

| Common Stock Index | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Management Fees | $16,941,000 | $17,128,091 | $16,652,145 | $18,242,114 | $19,655,213 |
| Sub-Advisory Fees | $2,421,062 | $2,449,890 | $2,390,873 | $2,832,443 | $2,832,443 |
| Core Bond Index | 2010 | 2011 | 2012 | 2013 | 2014 |
| Management Fees | $19,178,000 | $23,825,307 | $22,174,885 | $25,202,830 | $28,819,978 |
| Sub-Advisory Fees | $921,872 | $1,125,066 | $1,060,703 | $1,194,221 | $1,355,503 |
| Equity 500 Index | 2010 | 2011 | 2012 | 2013 | 2014 |
| Management Fees | $6,904,000 | $7,305,604 | $7,573,555 | $8,958,975 | $10,303,570 |
| Sub-Advisory Fees | $1,028,713 | $1,076,679 | $1,109,128 | $1,275,835 | $1,438,523 |
| Intermediate Government Bond Index | 2010 | 2011 | 2012 | 2013 | 2014 |
| Management Fees | $6,385,000 | $7,679,433 | $25,394,641 | $26,408,687 | $27,163,333 |
| Sub-Advisory Fees | $364,906 | $426,427 | $1,202,720 | $1,247,383 | $1,280,777 |

JA207-JA208, JA1283-JA1286, JA1298, JA1300, JA1319, JA1332, JA1339-JA1341

| Common Stock Index | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Administration Fees | $5,006,000 | $5,037,297 | $4,884,303 | $5,343,982 | $5,731,635 |
| Sub-Administration Fees | $415,018 | $416,791 | $405,492 | $439,049 | $468,276 |
| Core Bond Index | 2010 | 2011 | 2012 | 2013 | 2014 |
| Administration Fees | $5,798,000 | $7,171,682 | $6,533,857 | $7,421,717 | $8,470,966 |
| Sub-Administration Fees | $466,801 | $573,526 | $536,341 | $601,994 | $682,325 |
| Equity 500 Index | 2010 | 2011 | 2012 | 2013 | 2014 |
| Administration Fees | $2,868,000 | $3,016,541 | $3,106,396 | $3,665,684 | $4,196,933 |
| Sub-Administration Fees | $245,347 | $256,658 | $264,299 | $306,131 | $346,674 |
| Intermediate Government Bond Index | 2010 | 2011 | 2012 | 2013 | 2014 |
| Administration Fees | $1,920,000 | $2,289,720 | $7,494,683 | $7,780,960 | $7,966,925 |
| Sub-Administration Fees | $168,857 | $197,862 | $612,627 | $630,419 | $642,921 |

JA210-JA211, JA1283-JA1286, JA1298, JA1300, JA1319, JA1332, JA1339-JA1341

## Management and Administration Profitability, Treating Sub-Advisor and Sub-Administration Fees as FMG Expenses but Omitting Allocated Expenses

| Common Stock Index | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Management Fee Profit Margin | 77.87% | 70.86% | 48.45% | 49.13% | 49.24% |
| Administration Fee Profit Margin | 84.66% | 85.25% | 84.38% | 73.79% | 87.06% |
| Core Bond Index | 2010 | 2011 | 2012 | 2013 | 2014 |
| Management Fee Profit Margin | 90.00% | 89.96% | 89.38% | 89.63% | 89.58 |
| Administration Fee Profit Margin | 85.06% | 85.64% | 84.47% | 74.90% | 87.17 |
| Equity 500 Index | 2010 | 2011 | 2012 | 2013 | 2014 |
| Management Fee Profit Margin | 78.10% | 81.29% | 81.77% | 82.12% | 81.97% |
| Administration Fee Profit Margin | 84.45% | 85.02% | 84.19% | 74.74% | 86.97% |
| Intermediate Government Bond Index | 2010 | 2011 | 2012 | 2013 | 2014 |
| Management Fee Profit Margin | 89.13% | 89.41% | 88.71% | 88.64% | 88.50% |
| Administration Fee Profit Margin | 84.27% | 84.98% | 84.48% | 74.90% | 75.07% |

JA1283-JA1286, JA1305-JA1308, JA1363-JA1365, JA1368

# CONCLUSION

For the reasons set forth above, the court's decision should be reversed and this matter should be remanded for a new trial.

Respectfully submitted,

**SZAFERMAN, LAKIND,
  BLUMSTEIN & BLADER, P.C.**


  s/ Arnold C. Lakind
Arnold C. Lakind

# CERTIFICATION OF COMPLIANCE

I hereby certify that:

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B).  This brief uses a monospaced typeface and contains 1285 lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(A)(7)(B)(III).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using WordPerfect X4 software and it is in Times New Roman proportionally-spaced typeface that is at least 14 points;

3.    The text of the PDF brief is identical to the text of the paper copies of the brief; and

4.    The electronic PDF file has been electronically scanned by Symantec virus detection program prior to transmission and no virus was detected.


                        s/ Arnold C. Lakind
                        Arnold C. Lakind

## REQUEST FOR ORAL ARGUMENT

Pursuant to L.A.R. 34.1, Plaintiffs-Appellants hereby request oral argument in the above matter.

Plaintiffs-Appellants believe that oral argument is necessary because it would be helpful to the Court since the issues in this matter are complex and the resolution of this appeal will involve matters of public importance that will broadly impact the ability of mutual fund investors, many of whom are retirement plan participants, to recoup excessive fees which significantly reduced the value of retirement accounts.

Plaintiffs-Appellants respectfully request thirty (30) minutes for argument.

s/ Arnold C. Lakind
Arnold C. Lakind

## CERTIFICATION AS TO BAR MEMBERSHIP

The undersigned hereby certifies that the attorney whose name appears on this brief was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit and is presently admitted as a member in good standing at the Bar of said Court.

s/ Arnold C. Lakind
Arnold C. Lakind

## CERTIFICATION OF FILING AND SERVICE

I certify that on this 15th day of August, 2017 true and correct copies of

Appellant's Brief and Joint Appendix, Volumes I - XV were filed electronically

with the Clerk of the Court for the United States Court of Appeals for the Third

Circuit by using the appellate CM/ECF system.  I further certify that I served the

Brief and Joint Appendix on the counsel listed below through the CM/ECF

system:

> Jonathan M. Korn, Esq.
> Blank Rome, lLP
> 301 Carnegie Center, 3rd Floor
> Princeton, NJ 08540
> Counsel for Defendant AXA
>
> Sean M. Murphy, Esq.
> Robert C. Hora, Esq.
> MILBANK, TWEED, HADLEY & McCLOY LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005
> Counsel for Defendant AXA

I further certify that I arranged for service of the Brief and Joint Appendix

on the counsel below:

> Sean M. Murphy, Esq.
> Robert C. Hora, Esq.
> MILBANK, TWEED, HADLEY & McCLOY LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005
> Counsel for Defendant AXA

I further certify that on this 15th day of August, 2017, I arranged for an

original and six (6) copies of the Brief and Volume I of the Appendix and four (4)

copies of Appendices Volumes I - XV to be sent via regular United States Postal

Service on August 21, 2017 to the Clerk of the Court, United States Court of

Appeals for the Third Circuit, 21400 United States Courthouse, 601 Market Street,

Philadelphia, PA 19106-1790.

_s/ Arnold C. Lakind_____
Arnold C. Lakind

United States Code Annotated
 Title 15. Commerce and Trade
  Chapter 2D. Investment Companies and Advisers
   Subchapter I. Investment Companies (Refs & Annos)

15 U.S.C.A. § 80a-35

§ 80a-35. Breach of fiduciary duty

Effective: July 22, 2010
Currentness

**(a) Civil actions by Commission; jurisdiction; allegations; injunctive or other relief**

The Commission is authorized to bring an action in the proper district court of the United States, or in the United States court of any territory or other place subject to the jurisdiction of the United States, alleging that a person who is, or at the time of the alleged misconduct was, serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts, or at the time of the alleged misconduct, so served or acted--

**(1)** as officer, director, member of any advisory board, investment adviser, or depositor; or

**(2)** as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.

If such allegations are established, the court may enjoin such persons from acting in any or all such capacities either permanently or temporarily and award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 80a-1(b) of this title.

**(b) Compensation or payments as basis of fiduciary duty; civil actions by Commission or security holder; burden of proof; judicial consideration of director or shareholder approval; persons liable; extent of liability; exempted transactions; jurisdiction; finding restriction**

For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With respect to any such action the following provisions shall apply:

**(1)** It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.

**(2)** In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances.

**(3)** No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments. No award of damages shall be recoverable for any period prior to one year before the action was instituted. Any award of damages against such recipient shall be limited to the actual damages resulting from the breach of fiduciary duty and shall in no event exceed the amount of compensation or payment received from such investment company, or the security holders thereof, by such recipient.

**(4)** This subsection shall not apply to compensation or payments made in connection with transactions subject to section 80a-17 of this title, or rules, regulations, or orders thereunder, or to sales loads for the acquisition of any security issued by a registered investment company.

**(5)** Any action pursuant to this subsection may be brought only in an appropriate district court of the United States.

**(6)** No finding by a court with respect to a breach of fiduciary duty under this subsection shall be made a basis (A) for a finding of a violation of this subchapter for the purposes of sections 80a-9 and 80a-48 of this title, section 78*o* of this title, or section 80b-3 of this title, or (B) for an injunction to prohibit any person from serving in any of the capacities enumerated in subsection (a) of this section.

**(c) Corporate or other trustees performing functions of investment advisers**

For the purposes of subsections (a) and (b) of this section, the term "investment adviser" includes a corporate or other trustee performing the functions of an investment adviser.

**CREDIT(S)**
   (Aug. 22, 1940, c. 686, Title I, § 36, 54 Stat. 841; Pub.L. 91-547, § 20, Dec. 14, 1970, 84 Stat. 1428; Pub.L. 94-29, § 28(7), June 4, 1975, 89 Stat. 166; Pub.L. 100-181, Title VI, § 622, Dec. 4, 1987, 101 Stat. 1262; Pub.L. 111-203, Title IX, § 929F(f), July 21, 2010, 124 Stat. 1854.)

15 U.S.C.A. § 80a-35, 15 USCA § 80a-35
Current through P.L. 115-43. Also includes P.L. 115-45. Title 26 current through 115-45.

End of Document                                                © 2017 Thomson Reuters. No claim to original U.S. Government Works.